**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| CASA DEL CAFFE VERGNANO S.P.A., a corporation organized under the laws of the Italian Republic; CAFFE VERGNANO USA CORP., a Delaware Corporation,<br>     *Petitioners-Appellees*,<br><br>v.<br><br>ITALFLAVORS, LLC, a Delaware limited liability company; ITALFLAVORS SAN DIEGO, LLC, a California limited liability company,<br>     *Respondents-Appellants*. | No. 13-56091<br><br>D.C. No. 3:12-cv-00655-JAH (DHB)<br><br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued June 5, 2015
Submitted March 15, 2016
Pasadena, California

Filed March 15, 2016

Before: Alex Kozinski and Consuelo M. Callahan, Circuit Judges, and Edward R. Korman, Senior District Judge.*

Opinion by Judge Korman;
Dissent by Judge Callahan

**SUMMARY**\*\*

**Arbitration**

The panel reversed the district court's order granting a petition to compel arbitration pursuant to the Convention on the Recognition of Foreign Arbitral Awards.

The panel held that the parties' franchise agreement, referred to as the "Commercial Contract," did not constitute a binding agreement under federal common law because there was no mutual intention to be bound. Reading the Commercial Contract and the parties' contemporaneously executed "Hold Harmless Agreement" together, the panel concluded that the Commercial Contract was no more than a sham agreement. Accordingly, the arbitration clause in the Commercial Contract was not enforceable.

---

   * The Honorable Edward R. Korman, Senior District Judge for the United States District Court for the Eastern District of New York, sitting by designation.

   ** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Callahan wrote that the parties did initially agree to be bound by the Commercial Contract. She therefore would affirm the district court's order referring to arbitration the question of whether and when the Commercial Contract was terminated.

**COUNSEL**

James R. Ballard and Owen M. Prasckievicz (argued), Schwartz Semerdjian Ballard & Cauley LLP, San Diego, California, for Respondents-Appellants.

Calvin E. Davis (argued) and Gary A. Collis, Gordon & Rees LLP, Los Angeles, California, for Petitioners-Appellees.

**OPINION**

KORMAN, District Judge:

This appeal from an order pursuant to the Federal Arbitration Act granting a motion to compel arbitration raises a significant issue of whether a party to a contract containing an arbitration clause may enforce the clause notwithstanding compelling evidence that the contract was not a binding agreement. The facts underlying the appeal are largely undisputed. Specifically, in early 2010, Cesar and Hector Rabellino began planning to open an Italian-style coffee shop in the United States. At the time, Hector was living in Argentina, but hoped to move to the United States and operate his own business. The Rabellinos formed ItalFlavors, LLC and began discussions with Caffe Vergnano, an Italian corporation, to open a franchise in America.

On September 23, 2010, the Rabellinos met with Tommaso Lambert, a representative of Caffe Vergnano, in Italy. During the course of their three-hour meeting, the parties signed two agreements. The first—dated September 23, 2010 and which the parties refer to as the Commercial Contract—appears to be a franchise agreement setting forth the rights and responsibilities of the parties. That agreement contains an arbitration clause providing that:

> Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or validity thereof, which is not [resolved] directly between the Parties, shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules as presently in force.

Per the terms set forth, the contract was to be construed according to Italian law with arbitration to be held in Geneva, Switzerland.

A Second Agreement—which the parties refer to as the Hold Harmless Agreement—was also signed that day. Although this agreement is dated September 24, 2010, neither party disputes that it was signed on September 23 during the same three-hour meeting as the Commercial Contract. The Hold Harmless Agreement provides in relevant part:

> At the express request of Mr. Hector Rabellino, as the legal representative of the company Italflavors LLC, with registered offices in Greenwhich [sic; Greenwich] CT 06831 USA, Casa del Caffe Vergnano S.p.A.

> has prepared and herewith delivers a copy of the contract denominated "Commercial Contract" dated September 23, 2010.
>
> The above-mentioned contract does not have any validity or effectiveness between the parties, as it was prepared and delivered by Casa del Caffe Vergnano S.p.A. solely for the purpose of allowing Mr. Hector Rabellino to submit a copy of it to the pertinent international agencies in order to obtain an entry visa to work in the United States of America. . . .
>
> This contract does not produce any effect between the parties, who as agreed will sign a future contract which will regulate their commercial relationship as soon as it is prepared in accordance with the federal and national laws of the United States of America.

According to the Rabellinos, the parties entered into the Hold Harmless Agreement because Caffe Vergnano had concerns that the Commercial Contract did not conform to U.S. franchise law and so sought to shield itself from liability by making the contract void while, at the same time, allowing Hector to use the Contract to obtain his visa. They contend that the parties intended to sign a binding contract at a later date. According to Lambert, the representative from Caffe Vergnano, the purpose of the Hold Harmless Agreement was not to render the Commercial Contract void, but rather to protect Caffe Vergnano from any liability in the event that Hector used the contract in a way that ran afoul of U.S. immigration laws.

ItalFlavors then began the process of opening a Caffe Vergnano franchise location in San Diego. This included signing an agreement with Caffe Vergnano regarding website domain registration and purchasing furniture, equipment, and coffee from Caffe Vergnano. ItalFlavors opened its franchise branch on April 20, 2011, but after months of struggles and financial failures, the store closed on December 20, 2011.

Blaming the failure of the venture on Caffe Vergnano's alleged failure to offer promised support, ItalFlavors filed suit in California, alleging a series of violations of California's Franchise Investment Law and Business and Professions Code. Subsequently, that action was stayed after Caffe Vergnano filed the petition to compel arbitration in the district court. The jurisdiction of the district court was properly invoked under 28 U.S.C. § 1331 and 9 U.S.C. § 203 (the Federal Arbitration Act) because the case arose under the Convention on the Recognition of Foreign Arbitral Awards. The district court ultimately held that "the issue of whether the broad arbitration clause contained in the Commercial Contract survives after the September 24, 2010 agreement took effect should be submitted to the arbitrator." Thus, it granted Caffe Vergnano's petition and issued an order compelling arbitration. This appeal followed.

## STANDARD OF REVIEW

We review a district judge's order to compel arbitration *de novo*. *In re Eber*, 687 F.3d 1123, 1126 (9th Cir. 2012). Similarly, legal conclusions regarding the existence of a valid, binding contract are reviewed *de novo* and factual findings underlying it for clear error. *U.S. for Use of Youngstown Welding & Eng'g Co. v. Travelers Indem. Co.*, 802 F.2d 1164, 1169 (9th Cir. 1986).

## DISCUSSION

Starting with first principles, we reiterate the Supreme Court's repeated admonition that "[a]rbitration is strictly a matter of consent." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks omitted); *see also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741–42 (9th Cir. 2014). Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers*, 363 U.S. at 582. Moreover, it is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock*, 561 U.S. at 296–97. While the Commercial Contract at issue here contained a clause committing the parties to arbitrate, the threshold issue is whether that document constituted a binding agreement at all. If it did not constitute such an agreement, it follows that the arbitration provision is not enforceable.

Because this case arises under Chapter 2 of the Federal Arbitration Act, the issue of whether the Commercial Contract constituted a binding agreement is governed by federal common law, *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 577–78 (7th Cir. 2007) (collecting cases), which, in turn, looks to "general principles for interpreting contracts." *GECCMC 2005-C1 Plummer St. Office L.P. v. J.P. Morgan Chase Bank*, 671 F.3d 1027, 1033 (9th Cir. 2012) (quoting *Klamath Water Users Prot. Assoc. v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)); *accord InterGen N.V. v. Grina*, 344 F.3d 134, 143–44 (1st Cir. 2003). Often, those general principles are found in

the Restatement (Second) of Contracts.  *See Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013) (looking to the Restatement (Second) of Contracts when determining basic principles of contract law in the maritime context where federal common law applies).

Under these principles, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."  Restatement (Second) of Contracts § 17 (1981); *see also Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 863 (1983) (White, J., concurring in part, dissenting in part) ("In its ordinary meaning, a 'contract' is a legally enforceable bargain, formed by mutual consent and supported by consideration.").  The mutual intention to be bound by an agreement is the *sine qua non* of legally enforceable contracts and recognition of this requirement is nearly universal.  *See* Restatement (Second) of Contracts §§ 2, 17; Cal. Juris. 3d Contracts § 67 ("Mutual consent for a contract is determined under an objective standard applied to the outward manifestations or expressions of the parties . . . .").  "Where all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously, there is no such manifestation of assent to the exchange as is required by this Section."  Restatement (Second) of Contracts § 18 cmt. c.  Indeed, although our decision does not turn on Italian law, on this point Italian law is in accord with American law.  *See Principles of European Contract Law and Italian Law* 94 (Luisa Antoniolli & Anna Veneziano eds., 2005) ("[P]romises made out of courtesy, as a joke, or in any other way that denotes the absence of a serious intention to create a binding legal relationship are not deemed enforceable.").

Thus, under federal common law—or, indeed, under any law of which we are aware—where the parties to a "contract" have not mutually consented to be bound by their agreement, they have not formed a true contract. "[M]utual consent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding." *Reigelsperger v. Siller*, 150 P.3d 764, 767 (Cal. 2007) (internal quotation marks omitted); *accord* Restatement (Second) of Contracts § 2 cmt. b ("The phrase 'manifestation of intention' [or consent] adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention.").

Looking to their external expression of intent, the parties did not manifest their intent to be bound by the Commercial Contract containing the arbitration clause. Reading the Commercial Contract and the contemporaneously executed Hold Harmless Agreement side by side, it is plain that the Commercial Contract was nothing more than a sham agreement designed as a ploy to aid Hector Rabellino's visa application. Notwithstanding Lambert's declaration that he understood the Hold Harmless Agreement to mean something other than it said, we look to the external indications of intent, not a party's undisclosed intentions. Here, the objective evidence contradicts Lambert's gloss on events. Indeed, even apart from the language in the Hold Harmless Agreement expressly declaring the Commercial Contract was not a binding agreement, the provision that the parties "will sign a future contract which will regulate their commercial relationship as soon as it is prepared in accordance with the federal and national laws of the United States of America" makes little sense if the Commercial Contract—which

10   CASA DEL CAFFE VERGNANO V. ITALFLAVORS

purportedly regulated their commercial relationship—was a binding agreement.

Moreover, it is appropriate to read the Commercial Contract and the Hold Harmless Agreement together because

> [w]hat appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham, or an agreement without consideration, or it may be voidable for fraud, duress, mistake, or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing.

Restatement (Second) of Contracts § 214 cmt. c. The parol evidence rule, which generally bars consideration of oral or written evidence altering the terms of a written integrated contract, does not prohibit us from considering the Hold Harmless Agreement because that agreement goes to the issue of whether the parties entered into a binding contract. *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 999 (9th Cir. 2001) ("Given the Restatement view . . . we conclude that parol evidence could be admitted, despite a seemingly valid, integrated agreement, to show the agreement was, in fact, a sham or cover-up for otherwise illegal activity."). As one commentator has aptly observed, when considering whether the parties have made a contract, "there is no 'parol evidence rule' to be applied. On [this] issue[], no relevant evidence, whether parol or otherwise, is excluded." 6 Peter Linzer, *Corbin on Contracts* § 25.2 at pgs. 8–9 (rev. ed. 2010).

Nor is there any merit to Caffe Vergnano's argument that ItalFlavors is bound by a judicial admission as to the

existence of a contract in California court. We need not tarry long with the details of the dispute between the parties as to whether ItalFlavors either implicitly or explicitly conceded validity of the Commercial Contract in the complaint that it filed in California. Although Caffe Vergnano presents the issue as one of binding judicial admission, that doctrine is inapplicable because the alleged admission was made in a separate case from the present action. *See Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1142 (5th Cir. 1991) (holding that admission in arbitration was not binding in district court suit on the same subject matter); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 932 n.71 (9th Cir. 1975), *disapproved on other grounds by California v. Am. Stores Co.*, 495 U.S. 271, 277–78 (1990). Instead, if any doctrine bars consideration of the issues here, it would arguably be judicial estoppel, which "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). In contrast to judicial admissions, "the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 605 (9th Cir. 1996). Nevertheless, we have "restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) (citing *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998); *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997)). Thus, Caffe Vergnano cannot assert judicial estoppel because the California case has been stayed almost since its inception, making any judicial reliance impossible.

In sum, the declaration in the Hold Harmless Agreement signed contemporaneously with the Commercial Contract proves that the latter was a mere sham to help Hector Rabellino obtain a visa. Thus, we conclude that the Commercial Contract was not a contract and is thus unenforceable.

## CONCLUSION

Because we find that the document the parties described as the Commercial Contract was a sham, the arbitration clause is no more enforceable than any other provision in that document. Under these circumstances, the district judge erred in compelling the parties to arbitrate their dispute.

Thus, the order of the district judge is **REVERSED**.

---

CALLAHAN, Circuit Judge, dissenting:

My colleagues cite the correct applicable law, but in my opinion they come to an incorrect factual conclusion. They conclude that the parties "did not manifest their intent to be bound by the Commercial Contract containing the arbitration clause." Op. at 9. I, on the other hand, agree with the district court that the parties did initially agree to be bound by the Commercial Contract. Accordingly, I would affirm the district court's order referring the question of whether and when the Commercial Contract was terminated to arbitration.

The Commercial Contract, which all admit was the first agreement to be signed, is an 18-page document that details the parties' agreement and obligations. However, it appears

that the parties had misgivings about the Commercial Contract.  They were concerned that the Commercial Contract would not conform to California's Franchise Investment Law and Business and Professions Code, but they also wanted to allow Hector to use the Commercial Contract to obtain a visa to work in the United States.

Their "solution" was a curious second agreement, the Hold Harmless Agreement.  This single-page document states that the Commercial Contract "does not have any validity or effectiveness between the parties" and provides that they "will sign a future contract which will regulate their commercial relationship."  But they never signed the envisioned contract.  Instead, they proceeded to act as contractually related parties for over a year, from September 23, 2010 until at least December 20, 2011, when Italflavors closed its store in San Diego.

The majority, by treating the Commercial Contract and Hold Harmless Agreement as a single document, concludes that the parties "have not mutually consented to be bound by their agreement, they have not formed a true contract."  Op. at 9.  Based on this factual finding, the majority, applying the applicable law, determines that it is for the court, not an arbitrator to determine whether a contract ever existed.

14     CASA DEL CAFFE VERGNANO V. ITALFLAVORS

I disagree with the majority's factual premise.[1]  The parties first entered into the Commercial Contract.  They mutually agreed to be bound by the Commercial Contract and its broad arbitration clause.  They then entered into a separate and distinct Hold Harmless Agreement.  They disagree as to the effect of this document.  Caffe Vergnano argues that the Hold Harmless Agreement did not really terminate the Commercial Contract, but was intended to protect it from possibly violating U.S. franchise laws or misuse of the Commercial Contract by Hector in seeking a visa.

Italflavors, however, argued that the Hold Harmless Agreement terminated the Commercial Contract.  For example, Italflavors alleges that it was Caffe Vergnano that

---

[1] In determining whether an arbitration provision is subject to the Convention, the district court first asked whether there was "an agreement in writing to arbitrate the dispute."  *See Chloe Z Fishing Co., Inc. v. Odyssey Re, Ltd.*, 109 F. Supp 2d 1236, 1243 (S.D. Cal. 2000).  The district court then implicitly found that there was such an agreement.  It held "that the issue of whether the broad arbitration clause contained in the Commercial Contract survives after the September 24, 2010 agreement took effect should be submitted to the arbitrator."  "When a district court uses extrinsic evidence to interpret a contract, we review its findings of fact for clear error."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009).  If the district court's factual determination is not adequately explained or supported by the record, we should remand to the district court to make further findings or take further evidence, rather than decide the contested factual issue.  *See DeMarco v. United States*, 415 U.S. 449, 450 n.1 (1974) (per curiam) (stating "that factfinding is the basic responsibility of district courts, rather than appellate courts, and that the Court of Appeals should not have resolved in the first instance this factual dispute which had not been considered by the District Court.").

"wanted to enter into a second agreement cancelling the Sept. 23 Agreement."[2]

Because the Commercial Contract was entered into before the Hold Harmless Agreement was signed, the district court, properly applying our law, determined that the dispute over whether and when the Commercial Contract was terminated should be referred to arbitration. *See McKinney v. Emery Air Freight Corp.*, 954 F.2d 590, 593 (9th Cir. 1992) ("Precepts laid down instruct us to distinguish between a dispute over whether a contract ever existed and a dispute over whether a contract has expired or has been terminated or repudiated. In the former case, the issue is for the court; in the latter, the issue is for the arbitrator if the breadth of the arbitration clause is not in dispute."); *Camping Constr. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1338 (9th Cir. 1990) (holding that the district court "itself ruled on the arbitrability question, and concluded that both the termination issue and the repudiation issue were arbitrable.").

Finally, I agree with the majority that Italflavors is not "bound by a judicial admission as to the existence of a contract in California court." Op. at 10–11. Italflavors' complaint in the state court asserted "[i]n September 2010, the parties executed at least two commercial contracts, based on Italian law, purporting to create a franchise relationship." Although this assertion may not be binding, it does reflect that Italflavors knew and accepted that it had signed the Commercial Contract before the Hold Harmless Agreement was formulated. Thus, the record supports the district court's

---

[2] The assertion that the parties entered into a second agreement is, of course, inconsistent with the position that the two agreements were considered or should be considered one.

factual determination that the parties agreed to contract with a broad arbitration clause, but might thereafter have terminated the Commercial Contract through the Hold Harmless Agreement. The district court thus properly referred the question of whether and when the Commercial Contract terminated to arbitration. I respectfully dissent and would affirm the district court's order.